IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| P.M., a minor, by his mother and next Friend, BRITTANY WHITWORTH And BRITTANY WHITWORTH and JONATHAN WHITWORTH, <br><br>Plaintiffs, <br><br>vs. <br><br>LANCE BOLINGER, et al., <br><br>Defendants. | Case No. 2:10-CV-04208-NKL |

**O R D E R**

Pending before the Court is Defendant Lance Bolinger's motion for summary judgment [Doc. # 52] on Plaintiff Brittany Whitworth's claims under section 1983 and Missouri state law, all arising from the Columbia Police Department's execution of a search warrant on the Whitworth residence. For the reasons stated below, the Court grants summary judgment in favor of Bolinger on all of Whitworth's claims.

**I.    Factual background[1]**

Jonathan Whitworth lived with his wife, Brittany Whitworth, and her seven year-old son, P.M., at a residence where the Columbia Police Department executed a search warrant

---

[1] In considering Bolinger's motion, the Court has drawn all reasonable inferences in favor of Whitworth, the non-movant.

1

on February 11, 2010. At the time the Whitworths owned a pit bull terrier named Nala weighing fifty to sixty pounds, and a dog named Bruno that was either a boxer-American bulldog mix or a Corgi mix. Defendant officers Cavener, Fox, Quintana, Schlude, Hendrick, Horrell, Clements, and Dodd were all members of or supporting officers for the SWAT team executing a search warrant on the Whitworth residence. Jeffry Rukstad is a narcotics detective with the Columbia Police Department who surveyed the Whitworth residence and videotaped the execution of the search warrant. The complaint also names the City of Columbia as a Defendant, as well as Officer Kyle Lucas and Officer Michael Parsons whose role in the litigation is not explained in the amended complaint or the briefing.

Jonathan Whitworth has past drug convictions, including a guilty plea to a charge of conspiracy to distribute cocaine in 2003 that resulted in a 15-month jail sentence. Detective Hall obtained a search warrant for the Whitworth residence after being told by citizens that Mr. Whitworth had been selling large quantities of marijuana since 2006, possessed one pound of high-grade marijuana in his residence, and was attempting to obtain cocaine, and after Hall conducted a trash pull at the Whitworth residence that produced paper clips testing positive for THC–a chemical found in marijuana. Sergeant Schlude prepared the tactical entry plan for executing the search warrant. Schlude considered it a high-risk operation because search warrants for narcotics are generally high-risk and because Mr. Whitworth in particular had a history of physically resisting arrests for narcotics. Schlude chose to proceed by dynamic entry–with the purpose of getting a team into a residence as quickly as possible so the suspect does not have time to find a weapon and confront the SWAT team.

2

When the SWAT team opened the front door of the Whitworth residence to execute the search warrant, they saw either one or two dogs that were either standing at the threshold or running toward it. Sergeant Schlude said something to the effect of "Oh shit, a pit bull." [Doc. # 53 at 15]. Sergeant Schlude then said "Go." Officer Cavener took a step forward and fired a shot at the pit bull, who was still standing at the threshold of the doorway after 1.09 seconds. Cavener testified that in his experience dogs usually retreated into the residence during an entry on a search warrant. After Cavener fired, the pit bull retreated into the residence. The officers heard a series of barks after entering.

The Whitworths allege in their amended complaint that the SWAT officers then "chased and pursued" one of the dogs into the kitchen, but they have not presented any facts supporting that characterization. [Doc. # 47 at 2]. Officer Fox entered the kitchen for the purpose of securing the residence [Doc. # 53 at 17; Doc. # 56 at 8], and when he did, there were already three other officers in there, as well as the pit bull, which was bleeding and running around the kitchen. Fox shot the pit bull because he recognized it to be a pit bull and because it was running at his legs and not stopping. Two other officers fired at the pit bull around the same time. One of these officers was Quintana, who stated in his report that he fired one round at the pit bull because he believed the dog was going to attack him. Officer Quintana had noticed the pit bull with its ears pinned back and postured in an aggressive manner, although he did not testify that it growled, barked, or approached him. [Doc. # 53 at 18; Doc. # 56 at 9]. Quintana was in close proximity with the pit bull at this point. Officer Horrell observed that right before the officers shot the pit bull, the pit bull had run into a

3

sliding glass door and had gotten up and began to scamper. Horrell later examined the other dog, Bruno, and observed blood on his leg.

When the first SWAT officer encountered Mr. Whitworth, the officer ordered Mr. Whitworth to get on the ground and put his hands behind his back. Mr. Whitworth got on the ground but put his hands behind is head. Officers told Mr. Whitworth a second time to put his hands behind his back. As Mr. Whitworth went to move his hands behind his back, Officer Hendrick's foot made a single contact with Mr. Whitworth's face and shoulder for the purpose of getting Mr. Whitworth to put his arms behind his back. [Doc. # 53 at 20; Doc. # 56 at 10]. The parties dispute whether this contact can correctly be characterized as a kick, but the Court views it as one for purposes of this motion. This kick caused Mr. Whitworth pain, but resulted in no bruising, broken bones, or broken skin, and Mr. Whitworth never received medical attention as a result. Mr. Whitworth was cursing during this altercation, in a manner that Schlude took for aggression. [Doc. # 53 at 19; Doc. # 56 at 10].

After seeing SWAT officers in her house, Mrs. Whitworth joined P.M. in the bedroom and shut the door. A SWAT officer entered the room, and lowered his gun when he saw Mrs. Whitworth and P.M. [Doc. # 53 at 11; Doc. # 56 at 5]. The officer, in a direct manner that did not constitute yelling, informed Mrs. Whitworth that she would need to leave the bedroom and come to the front of the house. *Id*. An officer, with gun pointed at Mrs. Whitworth and P.M., told them to step past Mr. Whitworth and sit a few feet from the door. The Whitworths allege in their amended complaint that officers shouted and yelled at Mrs. Whitworth and P.M. [Doc. # 47 at 17], but never direct the Court to any evidence of this fact

4

other than their claim that Mr. Whitworth heard yelling when he was on the ground. [Doc. # 56 at 13]. Mrs. Whitworth asked if herself and P.M. could move positions to avoid the sight of their deceased dog, and officers brought them outside and into the back of a police car. Mrs. Whitworth had asked for a blanket and shoes before leaving the house, and Officer Dodd complied with this request. Officer Clements entered the police car and whispered to Mrs. Whitworth that one dog was dead and the other had been shot in the leg. Mrs. Whitworth asked for the police car to be moved forward so her and P.M. could not see Nala's body brought out of the house, and Clements complied.

    Mrs. Whitworth and P.M. were in the police car for two hours. P.M. was sobbing while in the police car. Mrs. Whitworth asked if her mother-in-law could come pick up P.M., but Clements refused. Police Officers instructed Mrs. Whitworth to leave the car at four different times, and supervised her each time she left. The first time, Detective Rukstad asked Mrs. Whitworth if she had any questions, and she asked Rukstad to tell P.M. that Nala was alive and being taken to be a police dog, with which Rukstad complied. The second time, Mrs. Whitworth went to her garage to get a mop. This was her longest absence from the police car, at seven to ten minutes. The third time, animal control arrived and informed Mrs. Whitworth that they had removed Nala's body and would be taking Bruno for medical attention. The fourth time, Mrs. Whitworth went to the master bedroom to wrap Bruno, who was bleeding in its paw, in a blanket for herself and animal control to carry out of the house. Clements never spoke to P.M. while Mrs. Whitworth was out of the police car. An officer then approached the police car to inform Mrs. Whitworth that they had completed the search

5

and the officer escorted Mrs. Whitworth and P.M. back into the house.

## II. Discussion

### A. Constitutional Claims

#### 1. Qualified Immunity

Bolinger argues that the SWAT officers are entitled to summary judgment on all of the Whitworths' constitutional claims, on grounds of qualified immunity. Police officers are entitled to qualified immunity unless a plaintiff can show that the officer violated a clearly established constitutional right. *Rohrbough v. Hall*, 586 F.3d 582, 585 (8th Cir. 2009). "Once the facts are established, a court should always be able to determine as a matter of law whether or not an officer is eligible for qualified immunity...." *Id.* at 586 (internal quotations omitted).

#### 2. Unreasonable Seizure of Mrs. Whitworth and P.M.

Mrs. Whitworth and P.M. allege that the police officer Defendants unreasonably seized and detained them by ordering them around, once at gunpoint, and keeping them in a police car for around two hours. Courts analyze such claims by determining whether each officer's actions were objectively reasonable from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The Whitworths concede that because they were residents at a house lawfully searched under a search warrant, the officer Defendants had initial authority to seize them under the Supreme Court's decision in *Michigan v. Summers*, 452 U.S. 692 (1981). But the Whitworths appear to argue that the facts of their case are less compelling than those in

6

*Summers*, and that it was thus unreasonable for the SWAT officers to detain Mrs. Whitworth and P.M. for two hours. Specifically, the Whitworths argue that–unlike the plaintiffs in *Summers*–Mrs. Whitworth and P.M. presented no flight risk, obviously did not own any of the little contraband found, were obviously cooperative and non-threatening, and did not threaten the orderly completion of the search. The Whitworths also argue that although the Supreme Court in *Muehler* allowed the detention, in handcuffs, of a resident for two to three hours while police searched a home, that case involved a search for weapons and wanted gang members, and cannot justify a two-hour search under the facts of the present case. *See Muehler v. Mena*, 544 U.S. 93, 100 (2005).

These arguments are persuasive, if at all, only when viewed in hindsight. The Court must view the officers' decisions from the viewpoint of a reasonable officer on the scene with knowledge that Mr. Whitworth had a history of resisting arrest. Such a police officer could reasonably detain Mrs. Whitworth and P.M for almost two hours for several reasons, including: (1) ensuring their safety from any altercation with Mr. Whitworth; (2) ensuring they were not able to participate in any plan set in place by Mr. Whitworth to frustrate the execution of the search warrant; (3) ensuring that the wounded dog still on the premises did not attack officers in an attempt to defend the Whitworths; (4) facilitating the search, including opening locked doors to minimize the use of force within the house; (5) assisting with removing the Whitworths' dogs–one alive and one deceased–from the Whitworth residence while allowing Mrs. Whitworth to accompany P.M. when possible and while keeping P.M. away from seeing the dogs. The Whitworths have brought forth no evidence

7

suggesting that they were detained for longer than necessary to complete the search while maintaining these safety objectives. Further, *Muehler* is more hurtful than helpful to the Whitworths' case. In both *Muehler* and this case, officers had reason to believe the suspects were dangerous, but the *Muehler* court upheld both a longer detention and a greater intrusion (handcuffs). *Muehler*, 544 U.S. at 95.

The Whitworths also argue that the amount of force the police officers used in seizing them renders the seizure unreasonable. Specifically, the Whitworths claim that police officers yelled at Mrs. Whitworth and P.M., with guns drawn, detained them in a police car for two hours; refused the Whitworths' request to relocate to Mrs. Whitworth's father-in-law's house during the search; and refused to speak to P.M. while leaving him alone in a car for periods of up to ten minutes. To support this argument, the Whitworths rely on a case denying qualified immunity on an excessive-force claim against officers who, guns drawn, tackled a mother in front of her children, *Doran v. Condon*, 5 F. Supp. 2d 1067, 1071 (D. Neb. 1998), *aff'd*, 187 F.3d 641 (Table) (8th Cir. 1999), and a case where the court found a reasonable juror could conclude that police officers pointing guns at children while serving a search warrant violated the Fourth Amendment. *Lucas v. City of Boston*, 2009 WL 1844288 (D. Mass. 2009).

Bolinger distinguishes *Doran* because that case involved physical contact with the plaintiff and because there police had already arrested the suspect elsewhere and knew he would not be at his home when they executed the search warrant. *Doran*, 5 F. Supp. 2d at 1069-70. The Court agrees *Doran* is distinguishable from the present case, where officers

8

knew Mr. Whitworth could be home and had a history of resisting arrest.

The Court also finds *Lucas* distinguishable from the present case. There, the court examined a claim for excessive force and found that pointing a gun at children was part of a series of actions that, "especially when taken together" could constitute a Fourth Amendment violation. *Lucas*, 2009 WL 1844288 at *19. Further, *Lucas* involved much more unreasonable behavior, such as "at least two officers" approaching a nine-year old girl in her night clothes, pointing a gun "at her head" and yelling at her to "get the fuck down," as well as officers pointing a gun two and a half feet from a twelve-year-old boy's face while asking him questions. *Id*.

The Whitworths have not alleged behavior approaching this level of aggression. The Court agrees that ideally officers would execute search warrants without pointing a gun at women and children not suspected of committing a crime. On the other hand, where officers are aware that a dangerous suspect and two large dogs are on the property, a reasonable officer could, in the heat of the moment, rely on such tactics to prod individuals to move swiftly through a potentially dangerous situation. This is especially true, where shouting and gun-pointing occurred as Mrs. Whitworth and P.M. stepped over Mr. Whitworth–who was lying on the floor–and the danger of resistance by any of the Whitworths was arguably at its highest. In this context, the behavior alleged by the Whitworths did not violate a clearly established constitutional right. The SWAT officers are thus entitled to qualified immunity on this claim.

### 3. Excessive use of Force

9

Mr. Whitworth claims that Officer Hendrick used excessive force in kicking Whitworth in the head and neck, violating his Fourth Amendment right against unreasonable seizure. The Court analyzes this claim under the standard of objective reasonableness. *Graham v. Connor*, 490 U.S. 386, 399 (1989). "The determination whether the force used to effect a seizure was reasonable ultimately requires a case-specific balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011). "Not every push or shove, even if it may later seem unnecessary in the peace of a Judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotes omitted). Bolinger argues that this claim is also barred by official immunity.

It is uncontested that Officer Hendrick's foot made a single contact with Whitworth, and that this occurred when Whitworth had his hands on the back of his head, rather than behind his back as ordered. It is also uncontested that Hendrick made contact for the purpose of getting Mr. Whitworth to put his hands behind his back. [Doc. # 53 at 20; Doc. # 56 at 10]. It is also uncontested that Whitworth suffered no injury from this contact except pain. Although the parties dispute whether this contact amounted to a kick, the dispute is immaterial in light of these facts and Hendrick's awareness that Whitworth had a history of resisting arrest. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Thus, even if Hendrick indeed kicked

10

Whitworth, a single kick to force swift compliance with an order, and to deter hesitation in compliance with future orders from a dangerous suspect, would be objectively reasonable in this context.

The cases cited by Whitworth do not undermine this conclusion. Whitworth cites *Johnson v. District of Columbia* for the proposition that an officer's kicking of a suspect can support an excessive-force claim. 528 F.3d 969, 978 (D.C. Cir. 2008). But that case involved multiple kicks to the groin and rested in part on the court's conclusion that the kicking served no public benefit. *Id*. at 975. The Court finds this distinguishable from the present case, which involved a single kick to the face and shoulder that served the benefit of forcing compliance with police orders that were designed for the safety of everyone present.

Whitworth argues that he was not an immediate threat at the time of the contact, and that he was not actively resisting arrest, and that this weighs against the reasonableness of Hendrick's actions. *See Graham*, 490 U.S. at 396. But Whitworth oversimplifies the situation. The officers on the scene ordered Whitworth to put his hands behind his back, and Whitworth instead placed his hands behind his head. Whitworth has not argued that this order stemmed from something other than a concern for safety. When Whitworth failed to comply with that order, he undermined the ordering officer's attempt to maximize safety, and Hendrick could reasonably perceive this as a signal that Whitworth was preparing to actively resist or to fail to comply with future orders designed to protect the safety of individuals at the scene.

Although Whitworth has argued that there could be other explanations for his

11

hesitation to comply with the police order besides an intent to resist arrest–such as misunderstanding the order or not hearing the order–Whitworth provides no authority to show how Whitworth's subjective motivations are relevant, and the Court finds them irrelevant to the question of what a reasonable officer would have done in Hendrick's place.

For purposes of this motion, the Court assumes that Hendrick's use of force was greater than a *de minimis* one and that Whitworth sustained actual injury. Even so, Whitworth's injury is a minor one, and Hendrick's single, minor use of force was reasonable in light of the government's purpose in ensuring compliance with police orders.

### 4. Deprivation of Property Interest

The Whitworths claim that the SWAT officers, by shooting the Whitworths' dogs and creating bullet holes in the Whitworths' house, unreasonably seized that property in violation of the Fourth Amendment. Courts analyze claims of unreasonable seizure resulting from meaningful interference with one's property under the objective reasonableness standard. *Graham*, 490 U.S. at 398.

The Whitworths rely for their claim on *Andrews*, which adopted the approach of other circuit courts holding that "an officer commits an unreasonable, warrantless seizure of property, in violation of the constitution, when he shoots and kills an individual's family pet when that pet presented no danger and when non-lethal methods of capture would have been successful." *Andrews v. City of West Branch*, 454 F.3d 914, 918 (8th Cir. 2006). But that case involved an officer who–while investigating a call about a stray dog–shot and killed, without provocation, a family dog in an enclosed yard that was standing within feet of its

owner. *Id.* at 916. But the present case, even viewing facts in the light most favorable to the Whitworths, involves a large dog standing its ground in the doorway that a SWAT team is about to enter, or running around a kitchen toward police officers. Even if the Whitworths' dogs were not acting aggressively, the Whitworths have not produced evidence that either of their dogs "presented no danger and [that] non-lethal methods of capture would have been successful." *Id.* Rather, these dogs, simply by standing their ground or running excitedly in the path through which the officers needed to quickly pass to secure the scene, stood to frustrate the officers' important objective of securing and searching the house, and presented a risk of attack to passing officers that was great enough to justify a reasonable officer in incapacitating the dogs. The bullet holes in the Whitworths' property are incidental to officers firing at the Whitworths' dogs, so they require no separate analysis for reasonableness. The Court concludes on these facts that the officers' actions were objectively reasonable in this context.

Further, even if the officer Defendants did violate the Whitworths' rights in shooting their dogs, the Whitworths have not shown that this was a clearly established right. The requirement that the right violated be clearly established "operates to protect officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006) (internal quotes omitted). Federal courts have spoken little about how dogs fit into the analysis of unreasonable seizure under the Fourth Amendment, as evidenced by the scant applicable precedent cited by the parties.

13

Dogs easily qualify as property that can be unreasonably seized by the state, but they also contain a latent threat to human safety that has rarely been weighed under the Fourth Amendment's objective-reasonableness standard. Although some dogs are friendly, others are bred and trained to kill, and dogs of either sort can be unpredictable both in their actions and in the signals they send. This unpredictability can increase if a dog is wounded or its owners are being subdued. The reasonable officer would consider all of this when forced into close proximity with a strange dog by the exigencies of executing a search warrant on a dangerous suspect. The Whitworths cite a Missouri statute outlining the legality of a civilian killing a dog in self defense, but that would not put a police officer on notice of the constitutional boundaries of subduing a large dog in a quickly changing situation such as this one. Because any constitutional right violated by the officer Defendants in shooting the Whitworths' dog was not clearly established, the officer Defendants are entitled to qualified immunity on this claim.

### 5. *Monnell* Claim and Failure to Train

The Whitworths also claim that the city of Columbia violated their constitutional rights by maintaining customs and polices exhibiting deliberate indifference to its citizens' rights and by failing to properly train and supervise the Defendants who are its employees. The Eighth Circuit "has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007). Because the Court finds no individual liability on the part of the officer Defendants, the Court must also grant

summary judgment in favor of the City of Columbia.

**B.    Claims Under Missouri State Law**

Bolinger claims that the SWAT officers are entitled to summary judgment on the Whitworths' state-law claims, on grounds of official immunity.  Official immunity bars tort claims for injuries caused by a public employee's discretionary acts.  *Kanagawa v. State*, 685 S.W.2d 831, 835 (Mo. banc 1985) (overruled on other grounds by *Alexander v. State*, 756 S.W.2d 539 (Mo. banc 1988)).  Discretionary acts are those that require "the exercise of reason in the adoption of means to an end and discretion in determining how or whether an act should be done or course pursued."  *Id.* at 836.  Official immunity does not apply to ministerial acts, that is, acts of a "clerical nature which a public officer is required to perform upon given facts...."  *Southers v. City of Farmington*, 263 S.W.3d 603, 611 (Mo. banc 2008).  Courts determine whether a public employee's act is discretionary or ministerial by examining the nature of their duties, the extent to which the act involves policymaking or the exercise of professional expertise or judgment, and the likely consequences of granting or withholding immunity.  *Kanagawa*, 685 S.W.2d at 836.

A discretionary act is not protected by official immunity if the act is "willfully wrong or done with malice or corruption."  *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008)*.*  Such an act is done with malice if the public employee "wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another."  *Blue v. Harrah's North Kansas City*, 170 S.W.3d 466, 480 (Mo. App. 2005) (internal quotes omitted).

15

### 1.    Intentional Infliction of Emotional Distress

The Whitworths first claim that the SWAT officers intentionally inflicted emotional distress on them by pointing guns and shouting at Mrs. Whitworth and P.M. while directing them around the scene, by shooting the Whitworths' dogs in the presence of the Whitworths, and by leaving P.M. in a squad car for up to ten minutes at a time with an officer who did not converse with P.M.

The Whitworths argue that these actions are not entitled to qualified immunity because the actions were either willfully wrong or done with malice or corruption. The Whitworths are correct that because their claim of intentional infliction of emotional distress against a police officer implies malice and bad faith, official immunity does not extend to these claims. *See Coates v. Powell*, 650 F. Supp. 2d 932, 943 (W.D. Mo. 2009), *aff'd*, 639 F.3d 471 (8th Cir. 2011), *cert. denied*, — S. Ct. —, 2011 WL 3472671 (2011).

But Bolinger is still entitled to summary judgment on the merits of this claim for intentional infliction of emotional distress. Such claims in Missouri require plaintiffs to show that the conduct was intended *only* to cause emotional distress to the plaintiffs. *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. banc 1997). Even assuming the police officers engaging in the challenged conduct intended to cause emotional distress to the Whitworths, each action also had a legitimate purpose consistent with the officers' duties of searching the premises while maximizing safety. The officers' pointing their guns and shouting carried the legitimate purpose of swiftly moving Mrs. Whitworth and P.M. through a potentially dangerous situation. The Whitworths have conceded that Hendrick's kicking Mr. Whitworth

16

carried the legitimate purpose of bringing him into compliance with a police order [Doc. # 53 at 20; Doc. # 56 at 10], and this served the legitimate purpose of protecting the safety of those at the scene and deterring future noncompliance by Mr. Whitworth. Finally, leaving P.M. in the car with an officer was necessary to allow Mrs. Whitworth to facilitate the search without exposing P.M. to a crime scene. As Bolinger points out, Officer Clements' decision not to speak to P.M. during periods while his mother was away carried the legitimate objective of not speaking to the child outside the presence of his mother–perhaps in an attempt to avoid the appearance of coercive questioning or simply to avoid interfering with Mrs. Whitworth's depictions to P.M. of what was going on around them. Under these circumstances, no reasonable juror could conclude that the officers' only intent was to injure Mrs. Whitworth or P.M. Thus, the police-officer Defendants are entitled to summary judgment on the merits of this claim.

### 2. False Imprisonment

The Whitworths next claim that the SWAT officers falsely imprisoned them by detaining Mrs. Whitworth and P.M. in a squad car for around two hours while officers searched the Whitworth residence for contraband. The Whitworths argue that this decision was a ministerial one because "Defendants have made clear that in their view that [sic] the Supreme Court mandates the detention of persons found in the location of a search warrant." [Doc. # 56 at 28]. Assuming this is true, it is irrelevant because the Whitworths concede that the SWAT officers had the authority to detain the Whitworths initially, and only challenge the method and duration of their detention. [Doc. # 56 at 15]. Bolinger correctly argues that

17

decisions about the method and duration of the detention were discretionary ones because they were the "adoption of means to an end." *Kanagawa*, 685 S.W.2d at 836. The Court finds that the decisions surrounding police detention of the Whitworths were discretionary and that official immunity applies.

The Whitworths also argue that summary judgment is improper, even if the decision was discretionary, because the SWAT officers imprisoned them with malice. The Court rejects this argument for the same reasons it found their seizure reasonable under the Fourth Amendment. No reasonable juror could conclude that these officers acted consistent with their duties, by both securing the Whitworths for the safety of all at the scene and by keeping them close to the scene to facilitate the search while it was conducted.

### 4. Assault and Battery

The Whitworths argue that Officer Hendrick's actions in kicking Mr. Whitworth in the shoulder and face constituted an assault and battery. The Whitworths argue that official immunity does not apply to this action because it did not further the officers' lawful objectives and was thus done with malice. As discussed above, however, the Whitworths have conceded that the kick was intended to get Mr. Whitworth to comply with the order to put his hands behind his back [Doc. # 53 at 20; Doc. # 56 at 10], and this carried the lawful objective of ensuring the safety of those present and discouraging future noncompliance with police orders. Thus, official immunity applies to bar this claim.

## III. Conclusion

Accordingly, it is hereby ORDERED that the motion for summary judgment filed by

Defendant Bolinger [Doc. # 52] is GRANTED on all counts.

                                              s/ Nanette K. Laughrey
                                              NANETTE K. LAUGHREY
                                              United States District Judge

Dated: November 21, 2011
Jefferson City, Missouri